UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

POWERVIP, INC. and
POWERVIP SA,

      Plaintiffs,

v.

STATIC CONTROL COMPONENTS, INC.,
INDUSTRIAL ENGINEERING &
DEVELOPMENT, INC., and INNOVATIVE
CARTRIDGE TECHNOLOGIES, INC.,

      Defendants.
_____/

Case No. 1:08-CV-382

HON. GORDON J. QUIST

# OPINION

## I. Introduction

Plaintiffs, Powervip, Inc. and Powervip SA, sued Defendants, Static Control Components, Inc. ("Static"), Industrial Engineering & Development, Inc. ("IED"), and Innovative Cartridge Technologies, Inc. ("ICT"), seeking a declaratory judgment that certain products manufactured and sold by Plaintiffs do not infringe upon patents owned by Defendants and that those patents are invalid.  Now before the Court is Defendants' Motion to Dismiss Complaint or, in the Alternative, to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), or for a More Definite Statement.  The Court has determined that further oral argument is not necessary to resolve the pending issues.  For the reasons set forth below, the motion will be denied.

## II. Facts and Procedural History

Static, a North Carolina manufacturer and seller of chips for aftermarket laser toner cartridges, is the owner by assignment of U.S. Patent Nos. 7,088,928 B2 (the "'928 patent") and 7,254,346 B2 (the "'346 patent"), both entitled "Systems and Methods for Universal Imaging

Components." ICT, a Florida company, similarly manufactures and sells chips for aftermarket laser toner cartridges and is the owner by assignment of U.S. Patent Nos. 7,187,874 (the "'874 patent"), entitled "Toner Cartridge Having a Printer-Detecting Universal Printer Chip," 7,221,886 B1 (the "'886 patent"), entitled "Electrical Connections for Circuit Boards on Universal Toner Cartridges," and 7,286,774 B1 (the "'774 patent"), entitled "Universal Printer Chip." ICT licenses its patents to IED, a "sister company" located in Florida. (Defs.' Mem. in Supp. at 2.) ICT and IED license patented chips to Static, which in turn sells the chips in Michigan.

Powervip SA is a foreign company located in Uruguay. Powervip SA also manufactures and sells chips for aftermarket laser toner cartridges.[1] Powervip, Inc. is a Michigan company and an authorized independent distributer and seller of Powervip SA's chips in the United States.

On January 22, 2008, Static and IED sent a letter to Powervip, Inc., notifying it of Static and IED's ownership and cross-license of multiple patents covering universal toner chips. (Pls.' Resp. Ex. 4.) Static and IED enclosed copies of their patents with the letter. Likewise, Static published an advertisement in the February, 2008, issue of *Recharger Magazine*, a nationally distributed industry publication, warning, "Don't risk IP infringement by purchasing from unauthorized vendors. Static Control is the only authorized provider of universal chips for HP printers." (Pls.' Resp. Ex. 5.) The advertisement states that Static's chips are licensed under one or more of the '928, '346, '874, '886, and '774 patents. (*Id.*)

Future Graphics, LLC ("Future"), a North Carolina company, is a customer of Powervip SA and purchases toner chips from it. On February 14, 2008, Static and ICT filed a complaint in the United States District Court for the Middle District of North Carolina (the "MDNC"), claiming that Future infringes the '928, '346, '874, and '774 patents by manufacturing, selling, and employing

---

[1] Defendants dispute that Powervip SA actually manufactures toner chips. Instead, Defendants allege, Soluciones Avanzadas S.A., an Argentinian company, manufactures chips that Powervip SA merely distributes. (Defs.' Reply at 2-3 & Ex. 1.) The manufacturer/distributor distinction is immaterial for purposes of the instant Opinion.

methods of using chips covered by those patents (the "MDNC action"). (Defs.' Mem. in Supp. Ex. B.) Future raised numerous counterclaims in response to Static and ICT's complaint, including a counterclaim for a declaratory judgment of non-infringement and invalidity of the patents in question as well as the '886 patent. (*Id.* Ex. C.)

Static and ICT allege that Future obtained the chips accused in the MDNC action from Powervip SA. With that in consideration, on April 25, 2008, Plaintiffs filed the complaint in the instant case, seeking a declaratory judgment of non-infringement and invalidity of the '928, '346, '874, '886, and '774 patents. Defendants filed the instant motion seeking dismissal of Plaintiffs' complaint in favor of the first-filed MDNC action, or because venue in this district is improper. Alternatively, Defendants move the Court to transfer this case to the MDNC. In the event that this case remains in the present venue, Defendants move the Court to order Plaintiffs to provide a more definite statement.

On October 1, 2008, the Court held oral argument, focusing specifically upon the issues of personal jurisdiction over ICT and IED in this Court and personal jurisdiction over ICT and IED in the MDNC, for purposes of ascertaining whether transfer to the MDNC would be permissible under 28 U.S.C. § 1404(a). Following the hearing, the Court issued an order directing Defendants to produce all license agreements to Plaintiffs and also directing the parties to submit supplemental briefs on these issues. Pursuant to the October 1, 2008, Order, Defendants have filed the license agreements under seal and the parties have filed supplemental briefs. The Court has reviewed these materials in detail, and the matter is now ready for decision.

### III.  Motion to Dismiss

#### A.  *The First-to-File Rule*

Defendants invoke the first-to-file rule, arguing that this case should be dismissed in favor of the first-filed MDNC action in order to avoid duplicating judicial resources. The first-to-file rule

3

is a generally recognized doctrine of federal comity, which provides that "'as a principle of sound judicial administration, the first suit should have priority,' absent special circumstances." *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989) (quoting *William Gluckin & Co. v. Int'l Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969)). The rule is applied "when actions involving nearly identical parties and issues have been filed in two different district courts." *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Associates, Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001).

In support of their first-to-file claim, Defendants posit that the MDNC action and this action cover the same patents and technology, and they involve similar parties because Future's source of the allegedly infringing chips is Powervip SA. Plaintiffs contend that the parties in the two cases are not "nearly identical" because neither Powervip SA nor Powervip, Inc. is a party to the MDNC action, and neither is the same as, or an entity related to, Future. Alternatively, Plaintiffs argue that this action should take precedence over the MDNC action pursuant to the customer-suit exception to the first-to-file rule. That exception may be justified where the first suit is filed against a mere reseller of the accused goods, while the second suit is a declaratory action brought by the manufacturer of the accused goods. *Kahn*, 889 F.2d at 1081.

The Court declines to follow the first-to-file rule. First, Future is not a nearly identical party to either Powervip SA or Powervip, Inc. Rather, Future is a customer of Powervip SA, and the companies have no apparent overlap in control. Second, it is generally accepted that the court which first obtained jurisdiction should determine whether or not to apply the first-to-file rule. *See Daimler-Chrysler Corp. v. GMC*, 133 F. Supp.2d 1041, 1044 (N.D. Ohio 2001) (it is "more appropriate, as a matter of judicial comity, for the court of first filing to determine whether to retain or relinquish jurisdiction, rather than leave it to the court of later filing to make that decision"). The decision to apply the rule is thus properly left to the North Carolina court. Finally, whether this suit should remain in the present forum is more fully addressed within the context of Defendants' alternative motion to transfer, discussed *infra*.

### B. *Venue and Personal Jurisdiction*

Defendants contend that this case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue. A declaratory judgment action alleging non-infringement and invalidity of a patent is governed by the general venue statutes–not by 28 U.S.C. § 1400(b). *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1583 (Fed. Cir. 1990). The general venue statute provides that a civil action in which jurisdiction is not founded solely on diversity of citizenship may be brought in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred,... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). A corporate defendant resides "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Thus, the venue issue is subsumed in the personal jurisdiction issue and venue lies *ipso facto* if the Court has jurisdiction over Defendants. *See North Am. Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994). The parties agree that Static transacts business in Michigan and is thus subject to personal jurisdiction in this district. The jurisdictional inquiry is therefore limited to IED and ICT.

Personal jurisdiction in a declaratory judgment action for non-infringement is "intimately related to patent law," and is therefore governed by Federal Circuit law. *Silent Drive, Inc. v. Strong Indus.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003). Where no discovery on the jurisdictional issue has taken place, the plaintiff need only make a prima facie showing of jurisdiction to defeat the motion to dismiss. *Trintec Indus. v. Pedre Promotional Prods.*, 395 F.3d 1275, 1282 (Fed. Cir. 2005) (citing *Silent Drive*, 326 F.3d at 1201). In its evaluation, the Court "must construe all pleadings and affidavits in the light most favorable to the plaintiff." *Id.* at 1282-83. Jurisdictional discovery is

"appropriate where the existing record is 'inadequate' to support personal jurisdiction and 'a party demonstrates that it can supplement its jurisdictional allegations through discovery.'" *Trintec Indus.*, 395 F.3d at 1283 (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351-52 (D.C. Cir. 2000)).

The Federal Circuit employs the following test to determine whether a district court has specific personal jurisdiction over a defendant in a patent case: whether jurisdiction exists under the state's long-arm statute; and if so, whether exercise of jurisdiction is consistent with the limitations of the Due Process Clause.[2] *Trintec Indus.*, 395 F.3d at 1279 (internal citations omitted).  However, Michigan's long-arm statute is "limited by due process, and therefore, the statute and due process share the same outer boundary."  *Green v. Wilson*, 455 Mich. 342, 350, 565 N.W.2d 813, 816 (1997).  The resulting question is whether jurisdiction over IED and ICT satisfies due process.

The Federal Circuit employs the following three-prong test for determining whether jurisdiction over an out-of-state defendant comports with due process:  (1) whether the defendant purposefully directed its activities at the forum; (2) whether the claim arises out of or relates to the defendant's actions within the forum; and (3) whether the assertion of personal jurisdiction is reasonable and fair.  *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995).

Defendants argue that IED and ICT's connections with Michigan are "virtually non-existent and, to the extent there are contacts, they are merely coincidental and bear no relationship whatsoever to the claims alleged in the Complaint."  (Defs.' Mem. in Supp. at 2.)  In particular, Defendants argue that IED and ICT's only contacts with the forum state are licensing chips to Static, which chips Static then sells in Michigan, and IED's letter apprising Powervip, Inc. of IED's patents.  Given Federal Circuit case law, Defendants underplay the significance of those activities in the forum state.

---

[2]Plaintiffs do not claim that the Court can exercise general personal jurisdiction over Industrial or Innovative.

In *Akro*, the Federal Circuit held that "infringement letters sent into a forum state accompanied by the grant of a license to an in-state competitor doing business in the state [are] sufficient to justify assertion of personal jurisdiction against an out-of-state patentee." *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455 (Fed. Cir. 1997) (citing *Akro*, 45 F.3d at 1548-49). The Federal Circuit later clarified that its holding in *Akro* applies to both exclusive licensees and distributors, whether they are incorporated or headquartered in the forum state or merely conducting business there, so long as the license or distribution agreement creates a relationship beyond the payment of royalties – such as the right to litigate infringement claims. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1365-66 (Fed. Cir. 2006) (internal citations omitted).

Despite Defendants' argument to the contrary, the Court construes Static and IED's January 22, 2008, letter as a cease and desist letter. Notably, the letter states "As fellow businessmen in the chip business we know, as you also know, it is important to keep apprised of other companies' technology." (Pls.' Resp. Ex. 4.) *See Breckenridge Pharm.*, 444 F.3d at 1367 n.8 ("As a practical matter, patentees and patent counsel today often write such accusatory letters artfully, and the type of implicit accusation of infringement contained in the Metabolite attorney letters has become the norm for what we traditionally refer to as 'cease and desist' letters").

The remaining question is whether the Cross License Agreement between Static, on the one hand, and IED and ICT on the other, suffices to subject IED and ICT to jurisdiction in Michigan for purposes of satisfying the due process inquiry. *See Avocent Huntsville Corp. v. Aten Int'l Co.*, \_\_ F.3d \_\_, 2008 WL 5216005, at \*7-8 (Fed. Cir. Dec. 16, 2008). Defendants contend that the Cross License Agreement "is simply an agreement that the parties will not bring infringement actions against one another," (Defs.' 10/28/08 Supplemental Mem. at 4), and that under the agreement, IED merely granted Static an "'exclusive worldwide, fully paid up, royalty-free license to practice the

7

Miller Technology . . . subject to IED's retention of its own right to practice the Miller Technology.'"[3]  (*Id.* at 4-5 (quoting Cross License Agreement § 2.1.3).)  Defendants assert that the parties are only obligated to *notify* each other of possible infringement by a third party, and neither party is obligated to participate in any infringement litigation.

The Court disagrees with Defendants' characterization of the Cross License Agreement as merely an agreement to refrain from suing each other with no further relationship.  The *Breckenridge* court's description of the license agreement at issue there provides some guidance on the sufficiency of the Cross License Agreement as a basis for jurisdiction in this case:

> Here, in addition to sending letters into the forum state . . . Metabolite has entered into an exclusive license with PamLab, a company that, while not headquartered or incorporated in Florida, conducts business in Florida.  As part of the license agreement, Metabolite granted PamLab the right to sue for patent infringement with Metabolite's written consent, and the parties agreed to "discuss in good faith the appropriate action, if any, with respect to third party infringers of the Licensed Patents, and to cooperate reasonably in any enforcement actions".  Metabolite granted PamLab "full control of the prosecution or maintenance" of any patent or application that Metabolite abandons or permits to lapse and agreed to provide PamLab with an executed power of attorney for that purpose. . . .

444 F.3d at 1366-67.

Although the Cross License Agreement does not contemplate ongoing royalty payments by Static to IED for the patents comprising the Miller Technology in the "non-exempt" field of use, it is exclusive and does contemplate an ongoing relationship in other respects.  For example, the agreement requires the respective patentees to pay the maintenance fees and annuities on their patents as they become due, but in the event a patentee decides to cease such payments because the patent is diminished in value, the licensee is granted the right to make the payment, resulting in a deemed assignment to the licensee. (Cross License Agreement § 2.3.)  The agreement also provides for joint enforcement of the Static/Miller Patents in new actions brought before the United States

---

[3]The "Miller Technology" refers to the technology covered by ICT's patents at issue in this case and in the MDNC action.

8

International Trade Commission against importers of chips that appear to infringe the subject patents. (*Id.* § 2.52.) The agreement further requires the parties and ICT "to cooperate on the strategy of a response to . . . possible infringement," (*id* § 2.5.3), and it grants both parties the right to "initiate litigation against infringers," with notice to the other party, (*id.* § 2.5.3.1). The other party may choose to participate in the litigation, in which case both parties are to meet and confer on the various aspects of the litigation. (*Id.*) If the other party declines to actively participate in the litigation, the non-participating party must, at the option of the initiating party, agree to be a party, in which case the initiating party may hire and pay for an attorney to represent the other party. (*Id.* § 2.5.3.2.) Moreover, the agreement provides that "[e]ach patent owner retains ultimate decision making authority as to strategic decisions involving its patents, and must approve any claims made in the suit concerning the scope, interpretation, validity and damages resulting from infringement of the owner's patents." (*Id.* § 2.5.3.3.) Finally, the agreement contains provisions requiring Static and IED to protect each others' patent rights by refusing to provide universal chips to any reseller who sells infringing chips which such reseller acquired from a source other than one authorized by Static or IED. (*Id.* §§ 2.5.4-2.5.6.)

The cited provisions of the Cross License Agreement are similar to those at issue in *Breckenridge* and arguably provide a stronger case for concluding that IED and ICT purposefully availed themselves of the privilege of conducting business in Michigan. That is, even though IED is not obligated to initiate a patent infringement case, it has agreed to be a party in infringement litigation if Static so chooses. Moreover, IED and ICT are required to cooperate on the strategy in response to a potential infringement. Thus, IED and ICT could reasonably anticipate that their relationship with Static could lead to their participation in litigation in Michigan to enforce the

patent rights covered by the Cross License Agreement.[4] Finally, as in *Breckenridge*, the relationship contemplated in the Cross License Agreement has actually resulted in such a cooperative relationship, based upon the joint letter sent by Static and IED to Plaintiffs. *See Breckenridge*, 444 F.3d at 1367.

Regarding the second prong of the test, Plaintiffs' lawsuit directly relates to IED's and ICT's contacts with Michigan. Defendants claim that this lawsuit arises out of technology developed by IED and ICT in Florida and the MDNC action because Plaintiffs filed this suit in response to that action. However, this action more accurately arises out of, and in direct response to, Static's and IED's attempts to enforce the patents at issue in Michigan.

Next, exercise of jurisdiction over IED and ICT is reasonable and fair. The cease and desist letter sent to Michigan, coupled with the warning advertisement placed in a nationally distributed industry magazine, belie Defendants' assertion that they did not reasonably expect to be haled into Michigan to defend their patents. Also, Michigan "most certainly has an interest in providing a forum for a resident who claims that a foreign corporation is attempting to prevent it from manufacturing and marketing its product." *Akro*, 45 F.3d at 1547-48. In short, IED and ICT have not provided a compelling case that jurisdiction over them in Michigan would be unreasonable.

In sum, Plaintiffs have demonstrated that personal jurisdiction over all defendants comports with the requirements of due process as set forth by the Federal Circuit. Consequently, dismissal for improper venue is not justified.

### IV. Motion to Transfer Venue

Defendants request that this case be transferred to the MDNC pursuant to 28 U.S.C. § 1404(a). That section provides, "For the convenience of parties and witnesses, in the interest of

---

[4]The same can be said for ICT on the basis of the provisions of the License Agreement between ICT and IED, which are substantially similar to the provisions of the Cross License Agreement.

10

justice, a district court may transfer any civil action to any other district or division where it might have been brought." The Federal Circuit recently stated that under § 1404(a), "The convenience and availability of witnesses, absence of jurisdiction over all necessary or desirable parties, possibility of consolidation with related litigation, or considerations relating to the interest of justice must be evaluated to ensure the case receives attention in the most appropriate forum." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008).

Defendants assert that the interests of justice would be better served by transfer because the patents at issue here and in the MDNC action are essentially the same, and having two different courts interpret the same patent claims would create a risk of inconsistent rulings. Defendants further argue that North Carolina is the center of the infringing activity where the majority of witnesses and documents are located, thus, litigating in the MDNC would allow for greater ease in administration and lower cost to the parties. Plaintiffs assert that transfer is unavailable under § 1404(a) because the MDNC lacks personal jurisdiction over all Defendants, and thus this action could not have originated in the MDNC. Plaintiffs further state that the accused activity did not take place in North Carolina, and transfer would only shift the burden of inconvenience from Defendants to Plaintiffs.

As the Court indicated at oral argument and in its directive for additional briefing, a primary consideration in Defendants' motion to transfer is whether all Defendants are subject to personal jurisdiction in North Carolina. This is important, because a court's power to transfer pursuant to § 1404(a) is limited by the requirement that jurisdiction and venue would have been proper in the proposed transferee district in the first instance. *See Ansell Healthcare Prods. LLC v. Tillotson Corp.*, 567 F. Supp. 2d 196, 200 (D.D.C. 2008). It is undisputed that venue and jurisdiction would be proper with regard to Static, which is headquartered in North Carolina, but there remains some question about whether IED and ICT would be subject to personal jurisdiction in North Carolina.

11

Defendants offer three arguments in support of personal jurisdiction. First, IED and ICT state that they would have submitted to the jurisdiction of the MDNC if Plaintiffs had sued them there. Second, they contend that ICT is subject to jurisdiction in North Carolina because it filed suit there against Future, Plaintiff's customer, asserting the same patents at issue in this later-filed case. Defendants contend that ICT's act of filing suit subjects it to personal jurisdiction under North Carolina's long arm statute and that this action was the direct result of ICT's suit against Future. Finally, Defendants contend that ICT and IED are subject to jurisdiction in North Carolina because the Cross License Agreement was negotiated, at least in part, in person in North Carolina and the agreement provides that it is to be governed by the law of North Carolina.

Defendants' first argument fails because their willingness to submit to jurisdiction in North Carolina cannot be a basis for transfer under § 1404(a). The Supreme Court has observed: "But the power of a District Court under § 1404(a) to transfer an action to another district is made to depend not upon the wish or waiver of the defendant but, rather, upon whether the transferee district was one in which the action 'might have been brought' by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343-44, 80 S. Ct. 1084, 1089-90 (1960). The Court said that such an argument, "if adopted, would empower a District Court, upon a finding of convenience, to transfer an action to any district desired by the defendants and in which they were willing to waive their statutory defenses to venue and jurisdiction over their persons." *Id.* at 344, 80 S. Ct. at 1090. Thus, Defendants must establish personal jurisdiction by some other means.

Defendants provide little analysis and cite no authority for their contention that ICT is subject to personal jurisdiction based upon its lawsuit against Future, and Plaintiffs fail to address this argument in their supplemental brief. The Court's own research, however, discloses some support for the proposition that a patentee's initiation of a lawsuit alleging infringement may be deemed either consent, or waiver of an objection, to jurisdiction in another suit against the patentee

12

in the same forum, so long as there is a logical connection between the two suits. *Neuralstem, Inc. v. Stemcells, Inc.*, 573 F. Supp. 2d 888, 897-98 (D. Md. 2008) (holding that the defendant was subject to personal jurisdiction in Maryland based upon its filing of a previous lawsuit against the plaintiff in Maryland involving patents with claims that were "virtually identical" to the patents at suit in the later-filed suit, thus, the two actions were significantly intertwined and involved the same transaction or occurrence); *Foster Wheeler Energy Corp. v. Metallgeselschaft AG*, Civ. A. No. 91-214-SLR, 1993 WL 669447, at *3 (D. Del. Jan. 4, 1993) (holding that the defendant-accused infringer was not entitled to dismissal for lack of personal jurisdiction because the defendant's earlier infringement case in the same forum against the patentee constituted consent to jurisdiction where the two suits "involve[d] *common issues of fact and law supported by some overlapping evidence*"). Other courts have held that the filing of prior or subsequent lawsuits in the same forum could suffice to establish purposeful availment of the forum. For example, in *Lyman Steel Corp. v. Gerrostaal Metals Corp.*, 747 F. Supp. 389 (N.D. Ohio 1990), the court held that the defendant's filing of a subsequent suit in the same forum involving some of the same parties, the same ship, and the same date of the incident alleged in the first suit was sufficient to support personal jurisdiction. *See id.* at 396 ("Voluntarily filing a lawsuit . . . where the facts similarly arise from the same series of events as another lawsuit can be deemed another indication of purposeful availment of the forum."). In the instant case, it is reasonable to conclude that by filing the MDNC action against Future asserting essentially the same patents at issue here, ICT consented to jurisdiction in North Carolina to a suit by Plaintiffs seeking a declaration of non-infringement or invalidity of the same patents against accused products sold by Plaintiffs.

Defendants' argument with regard to IED is not so persuasive. While it may be true that IED and/or ICT consented to jurisdiction in North Carolina in connection with the Cross License Agreement, nothing in the record suggests that such consent extends to suits by third parties.

13

Moreover, although the Cross License Agreement has some tangential relationship to this lawsuit, it cannot be said that Plaintiffs' declaratory judgment action arises out of the Cross License Agreement. In fact, both the choice of law and forum selection provisions in the Cross License Agreement are specifically limited to disputes arising under that agreement. (Cross License Agreement §§ 4.1, 4.16.) Because this case does not arise under the Cross License Agreement, any consent thereunder by IED to jurisdiction in North Carolina does not extend to this case. Accordingly, the lack of jurisdiction over IED in North Carolina precludes a transfer of this case to the MDNC under § 1404(a). *See Dekalb Genetics Corp. v. Syngenta Seeds, Inc.*, No. 4:06CV01191ERW, 2006 WL 3837143, at *4-5 (E.D. Mo. Dec. 29, 2006).

      Regardless of whether the case could have properly been brought in the MDNC, transfer is not justified. As an initial matter, the Western District of Michigan was Plaintiffs' first and only choice of forum, in which Powervip, Inc. maintains its principal place of business and in which Powervip SA regularly conducts business. Also, witness convenience and access to evidence do not favor transfer. While many of Static's witnesses and documents are located in North Carolina, IED and ICT's witnesses and documents are located in Florida. Plaintiffs' witnesses and documents are located in South America and Michigan, where the allegedly infringing chips are manufactured and sold, respectively. Furthermore, non-party witnesses will likely come from California, New York, Virginia, and Florida. (Defs.' Mem. in Supp. at 6.) Ultimately, only one party–Static–would benefit to any significant degree from transfer to the MDNC. Transfer would, as Plaintiffs point out, only shift inconvenience and costs from Defendants to Plaintiffs. Also critically, the interests of justice do not necessarily favor transfer. Defendants provide no indication that the MDNC would consolidate this and the MDNC action, especially when the MDNC action involves a myriad of collateral issues specific to Future. Thus, consolidation could possibly create inefficiencies relating to discovery disputes and confusion of issues.

Put succinctly, Defendants' core consideration for transfer is litigating in a forum most convenient to themselves. As Plaintiffs aptly note, if Defendants were truly concerned with duplicating judicial resources and risking inconsistent rulings, they could simply move for a stay in the MDNC action.

### V. Motion for a More Definite Statement

Finally, Defendants request that the Court order Plaintiffs to provide a more definite statement. Under Fed. R. Civ. P. 12(e), "if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Defendants argue that Plaintiffs' complaint is too vague and ambiguous to allow Defendants to prepare a responsive pleading. In support, Defendants reason that Plaintiffs have specified which patents they allege are non-infringed and invalid yet fail to specify which of their products or services do not infringe the patents at issue.

Defendants' February 14, 2008, complaint in the MDNC action alleges that Future infringes upon Defendants' patents by:

> ...making, using, offering to sell, selling, or importing, and/or contributing to the use by others, of chips having item numbers HPUCHIPA, HPUCHIPA2, HPUCHIPX, HPUCHIPX2, HPUCCHIPC5, HPUCCHIPC7, HPUCCHIPK, HPUCCHIPM5, HPUCCHIPM7, HPUCCHIPY5, and HPUCCHIPY7, and the methods of using these chips that are covered by one or more of the claims of the '928 and '346 patents.
>
> ***
>
> ...making, using, offering to sell, selling, or importing, and/or contributing to the use by others, of chips having item numbers HPUCHIPA2, HPUCHIPX2, HPUCCHIPC5, HPUCCHIPC7, HPUCCHIPK, HPUCCHIPM5, HPUCCHIPM7, HPUCCHIPY5, and HPUCCHIPY7, and the methods of using these chips that are covered by one or more of the claims of the '774 patent.

(Defs.' Mem. in Supp. Ex. 2.) Plaintiffs' complaint in this action repeats the above portions of Defendants' MDNC complaint. (Compl. at ¶¶ 17-18.) Plaintiffs' complaint alleges that "Future

15

Graphics is a customer of Powervip SA in that Future Graphics has purchased chips from Powervip SA. Further, the chips accused by Static and Innovative, identified in paragraphs 17-18 as infringing their respective patents were purchased from Powervip SA." (*Id.* at ¶ 21.) The only logical conclusion is that the chips at issue in the instant case are those that Plaintiffs sold to Future, with the item numbers listed in paragraphs 17-18. Accordingly, Plaintiffs' complaint does specify which of its products do not infringe the patents at issue, and the complaint is not so vague or ambiguous that Defendants are unable to frame an answer. Indeed, it would be paradoxical for Defendants to claim that Plaintiffs' complaint is lacking in specificity when it uses virtually the same language as Defendants' pleading in the MDNC action to identify the allegedly infringing products. Defendants' motion for a more definite statement is therefore without merit.

## VI. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Complaint or, in the Alternative, to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), or for a More Definite Statement will be denied.

A separate order will issue.


Dated: January 21, 2009                               /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE